IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| ANDREW CORY GASKINS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 2:20-cv-463-RAH-WC |
| | ) [WO] |
| CITY OF WETUMPKA, *et al.*, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION AND ORDER**

The underlying facts of this case begin with a motor vehicle accident and end with the arrest and criminal conviction of Plaintiff Andrew Gaskins,[1] who arrived at the scene of the accident to help his mother, one of the drivers involved in the collision.

Following these events, Gaskins brought this action against two of the on-scene police officers, the City of Wetumpka, and Wetumpka's Chief of Police. In his Complaint, Gaskins brings claims for a violation of his First Amendment rights, false arrest, excessive force, negligence, assault, and outrage. Pending before the

---

[1] The Complaint uses the last name "Gaskin" and "Gaskins" interchangeably and Gaskins's attorney filed the case under the name "Gaskin." However, the Plaintiff's last name, according to the Plaintiff himself, is "Gaskins." Accordingly, the Court uses "Gaskins" throughout this opinion.

Court is the Defendants' Motion for Summary Judgment. (Doc. 33.) The motion has been fully briefed and is ripe for review.

## I.  BACKGROUND

On July 5, 2018, Gaskins's mother was involved in a motor vehicle accident near the intersection of US Highway 231 and Alabama Highway 14 in Wetumpka, Alabama. (Doc. 35-1 at 13.) Wetumpka police quickly arrived on the scene. Shortly after the police arrived, Gaskins arrived on the scene to check on his mother and to document the accident. Gaskins pulled up to the accident in a white Chevrolet Trailblazer SUV carrying himself, his eleven-year-old daughter, and his nine-year-old son. (*Id*. at 8.)

Gaskins parked his SUV in the roadway next to his mother's vehicle. Gaskins then exited his SUV, and with permission from one of the police officers, began unloading items from his mother's car to prepare it to be towed. (*Id.* at 15.) After Gaskins unloaded his mother's car, police officers asked Gaskins to move his SUV out of the roadway and onto the shoulder. (*Id.* at 17.) Gaskins complied and drove the SUV onto the shoulder as requested. (*Id*.)

After parking, Gaskins exited his SUV and began to take pictures of the scene. (*Id.*) At this point, an ambulance had arrived and began tending to Gaskins's mother. (*Id.* at 18.)  Meanwhile, Gaskins continued to take pictures. (*Id.* at 17–18.)

This is where the parties' stories largely begin to diverge. At some point, according to Gaskins, an officer told Gaskins to "get your damn ass out of here." (*Id.* at 18–19.) But Gaskins did not leave the scene.[2] Instead, Gaskins told the officer that being a police officer did not give him the right to talk to Gaskins in that manner. (*Id.* at 19.) Two more officers then approached—Officers David Fletcher and Brandon Foster—and specifically told Gaskins to return to his vehicle.[3] (*Id.* at 20.)

The officers claim that rather than immediately returning to his vehicle, Gaskins became belligerent and continued to protest that he did not have to comply with law enforcement. (Doc. 33-5.)

Gaskins, on the other hand, says he complied with the instruction to return to his vehicle. There, he sat cross-legged in the trunk of the SUV and continued to observe his mother. (*Id*. at 20, 22.) Fletcher and Foster then approached the open back hatch of the SUV and ordered Gaskins to leave the scene. (Doc. 35-1 at 22.)

According to Gaskins, he was not given time to comply with this order. After being instructed to leave by Fletcher and Foster, Gaskins tried to explain to the

---

[2] For Gaskins's part, he testified that he did not "get [his] damn ass out of here" because he did not understand what the officer meant by saying "get your damn ass out of here." That is, Gaskins claims that he was uncertain what the officer meant by "here." Was the officer telling him to step aside, to move to the shoulder, to go to his car, or to leave the scene altogether? (*See* Doc. 35-1 at 21 (Responding to why he did not leave the road, Gaskins testified that the officer "said to get your damn ass out of here. He did not say the road.").)

[3] While Gaskins contends that prior to this time he did nothing disruptive or said anything offensive other than chastising an officer for being rude to him, Fletcher testified that "from the time he pulled up to the scene" Gaskins "was very disruptive" and "would not listen to law enforcement and took a simple accident and turned it into a fiasco." (Doc. 33-2 at 52.)

3

officers that his mother was still on the scene, but before he could finish his sentence, Fletcher and Foster reached inside the SUV, grabbed Gaskins by both arms, "ripped" Gaskins out of the SUV face-first, "slammed" him down onto the ground, pinned Gaskins's arms behind his shoulders to immobilize him, and handcuffed his hands behind his back. (Doc. 35-1 at 22–24, 31; Doc. 35-2 at 3.) Gaskins testified that he never jerked away from the officers, or fought, or resisted the officers in any way while in his SUV or as he was being arrested. (Doc. 35-1 at 41.)

The officers tell a different story of persistent arguing, refusals to leave, and an attempt by Gaskins to pull away or resist when Foster began attempting to pull Gaskins out of the SUV to arrest him for obstruction. (Doc. 33-5.)

But back to Gaskins's story. Laying on the ground, Gaskins began screaming for help. Between pleas for help, Gaskins began crying from confusion and pain. (*Id.* at 24.) Gaskins's children watched and screamed from the backseat. (*Id.*) While restraining Gaskins, Foster looked at Gaskins and told him that he was "a piece of shit." (*Id.*) Then, Foster turned towards Gaskins's kids, began yelling at them, and told them that their father was a "piece of shit." (*Id.*)

At this point, Officer Charles Shannon responded to Gaskins's cries for help and walked over and asked what Foster and Fletcher were doing. (*Id.* at 24–25.) They told Shannon that Gaskins was resisting arrest. (*Id.* at 25.) According to Gaskins, Shannon told Foster and Fletcher that Gaskins was not resisting arrest and

4

asked again, "What are y'all doing?" (*Id.*) And then Shannon told Gaskins to "just do what they ask." (*Id.*) Fletcher then lifted Gaskins to his feet by his handcuffed wrists. (*Id.* at 33.) Once standing, Gaskins was escorted to a police vehicle and placed inside. (*Id.* at 25.)

After Gaskins had been secured in the police vehicle, one of the officers went to retrieve Gaskins's children. As Gaskins's son puts it, the officer reached into the cracked backseat window and grabbed at the Gaskins children, telling them that their dad was a "piece of S-word, and he was going to jail and [they] were going to DHR." (Doc. 35-2 at 5.) The children got out of the SUV and were put into the back of a police vehicle. (*Id.*)

Gaskins was then taken to the Elmore County Jail and charged with obstruction of government operations. Gaskins was released from the jail a few hours later, but not before speaking with Fletcher again. According to Gaskins, Fletcher approached him and apologized for the ordeal, shaking Gaskins's hand, and telling Gaskins that he would get all his money back and that Fletcher "would go to bat for [Gaskins] in court." (*Id.* at 27.)

But the criminal obstruction charge against Gaskins proceeded. Roughly six months after his arrest, Gaskins was convicted of the charge in the Wetumpka Municipal Court. (Doc. 33-9.) Gaskins appealed, but ultimately plead guilty to obstruction in circuit court. (Doc. 33-10.)

Gaskins contends that the force used on him during his arrest tore his rotator cuff and bicep, injuries for which Gaskins would later undergo surgery. (*Id.* at 5, 33.) He also claims that his knees were scraped, gashed open, and caused to bleed. (*Id.* at 4–5.)

## II.   THE CLAIMS

Gaskins filed suit against the City of Wetumpka, Wetumpka Police Chief Greg Benton, Officer David Fletcher and Officer Brandon Foster. (Doc. 1.) His Complaint brings the following federal and state law claims:

- Count I – First Amendment Retaliatory Arrest under §1983
- Count II – First Amendment Prior Restraint under §1983
- Count III – False Arrest under §1983
- Counts IV and V– Excessive Force under §1983
- Count VI – Negligence
- Count VII – Assault against Officer David Fletcher
- Count VIII – Outrage against Officer David Fletcher

## III.   JURISDICTION AND VENUE

Subject matter jurisdiction is conferred by 28 U.S.C. § 1331 as to Gaskins's federal causes of action, and the Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  The parties do not contest personal

6

jurisdiction or venue, and there are adequate allegations to support both. *See* 28 U.S.C. § 1391.

## IV. STANDARD OF REVIEW

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a), (c). No genuine issue of material fact exists if the opposing party fails to make a sufficient showing on an essential element of her case as to which she would have the burden of proof. *Celotex*, 477 U.S. at 322–23.

Just as important, the "mere existence of a scintilla of evidence in support of the [non-moving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this assessment, the Court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party," *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997), and "resolve all reasonable doubts about the facts in favor of the non-movant," *United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir. 1990).

## V.   DISCUSSION

At the Court's recent pre-trial conference, Gaskins conceded that summary judgment is appropriate as to the state law claims for negligence, assault, and outrage and the federal § 1983 claims for false arrest and a violation of the First Amendment, representing to the Court that Gaskins now is only proceeding under his excessive force claims; that is, Counts IV and V. (Doc. 46.)  Therefore, as a threshold matter, summary judgment is due to be granted on all claims alleged in the Complaint other than the excessive force claims in Counts IV and V on grounds that these claims have been abandoned.  The Court now turns to the two remaining counts.

Gaskins brings three separate excessive force claims: two against the individual officers at the accident scene and one against the City of Wetumpka.  In Count IV, Gaskins contends that Officer Fletcher violated his Fourth Amendment right to be free from excessive force by "jerking Gaskins up by his wrist while handcuff[ed] behind his back." (Doc. 1 at 6.) In Count V, Gaskins contends that Officers Fletcher and Foster used excessive force "while arresting" Gaskins, and that the City of Wetumpka violated his Fourth Amendment right to be free from excessive force through the City's policies and customs.  (Doc. 1 at 6; Doc. 35 at 4.)

**A. The Arrest**

In Count V, Gaskins contends that Officers Fletcher and Foster used excessive force "while arresting" Gaskins. (Doc. 1 at 6.) Unlike Count IV, which specifically

8

targets how Gaskins was lifted by his wrists after being handcuffed on the ground, Count V does not provide any detail as to what specific use of force during his arrest is being challenged. Nevertheless, the Complaint in its entirety targets the manner by which the officers allegedly "ripped" Gaskins from his SUV and "[threw] him to the ground" face-first without warning. (Doc. 35 at 4.) Therefore, the Court will proceed to analyze Count V under this central allegation; that is, the manner by which Gaskins was removed from his SUV.

Officers Fletcher and Foster have asserted the defense of qualified immunity. Qualified immunity serves as a total bar to suit. To be protected by qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority. *Harbert Int'l Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). Because it is undisputed in this case that all the officers involved were acting within their discretionary authority, it falls to Gaskins to "show that qualified immunity should not apply." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291 (11th Cir. 2009.) To do so, Gaskins must establish (1) that the officers violated a constitutional right and, if so, (2) that the relevant right was "clearly established" at the time of the alleged misconduct. *See Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021).

Fletcher and Foster (the Officer Defendants) argue that they are entitled to qualified immunity because (1) no constitutional right was violated when they

9

removed Gaskins from his vehicle and (2) that even if there was a violation of a constitutional right, the right had not been clearly established at the time of the alleged violation. The Court disagrees on both accounts and finds, as explained below, that the Officer Defendants are not entitled to qualified immunity at this stage in the litigation.

### (1) Constitutional Violation[4]

"The Fourth Amendment encompasses the right be free from the use of excessive force during an arrest." *Scott v. City of Red Bay, Alabama*, 686 F. App'x 631, 633 (11th Cir. 2017). While making an arrest, an officer has the "the right to use some degree of physical force . . . but the force used must be reasonably proportionate to the need for that force." *Id*. (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1190 (11th Cir. 2002)) (internal quotations omitted).

"In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). To determine whether an officer's use of force was objectively reasonable,

---

[4] A claim of excessive force "presents a discrete constitutional violation relating to the manner in which an arrest was carried out." *Bashir v. Rockdale Cty*., Ga., 445 F.3d 1323, 1332 (11th Cir. 2006). The claim is "independent of whether law enforcement had the power to arrest" in the first place. *Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008). Here, Gaskins does not predicate his excessive force claim solely on the allegation the officers lacked the authority to arrest him. Because his excessive force claim against Fletcher and Foster is "discrete" from his false arrest claim, the Court will "discuss the excessive force claim without regard to the propriety of the underlying arrest." *Andrews v. Scott*, 729 F. App'x 804, 810 (11th Cir. 2018).

courts look to several factors, including: "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted and, (4) whether the force was applied in good faith or maliciously and sadistically." *Id*.

The Eleventh Circuit recently addressed a materially similar excessive force claim in *Ingram v. Kubik,* No. 20-11310, 2022 WL 1042688, at *5 (11th Cir. Apr. 7, 2022). There, the court concluded that the plaintiff had satisfied his burden of showing that the officer had violated the Fourth Amendment during an October 2017 interaction with law enforcement:

> All of the factors articulated in *Graham* weigh in favor of [Ingram]. Although Kubik implies that "the use of force [was] justified because suicidal subjects sometimes make erratic moves that can jeopardize the safety of the officers," "viewing the [alleged] facts in the light most favorable to [Ingram]," there is "no indication that [Ingram] made any threatening moves toward the police." The deputies had searched Ingram and confiscated the knife with which he had cut himself, so they knew he was unarmed. Before Kubik body slammed him, Ingram had his hands over his head. And there was no sign that he sought to flee when he was seized. Accepting these allegations as true, Ingram "was not actively resisting arrest, and there is no [allegation] that he struggled with the police" at the time of the seizure. Although Kubik could lawfully seize Ingram, the "extent of the injury [he] inflicted" was significant enough to confirm the already tenuous nature of the relationship between the "need for application of force" and the "amount of force used."
>
> We conclude that the force used was not "reasonably proportionate to the need for that force." "Because [Ingram] was not committing a crime, resisting arrest, or posing an immediate threat to the officers at the time he was [body slammed]," Kubik "used excessive force when

11

> apprehending [Ingram]." So, Ingram has satisfied his burden to show that "the officer violated a constitutional right."

2022 WL 1042688, at *5–6.

Similarly, in the instant case, according to Gaskins's testimony, at the time Gaskins was slammed to the ground, he was not resisting arrest, he was not threatening, he was not attempting to flee, and he was docile, sitting cross-legged in the trunk of his SUV with the lift-gate open so that he could observe his mother as she was being treated and placed inside an ambulance. While Gaskins sat in the SUV, the Officer Defendants approached and told Gaskins to leave the scene, but before Gaskins had time to respond that he was observing his mother, the Officer Defendants reached into the SUV, grabbed Gaskins's arms, "ripped" him out of his SUV, and slammed him face-first on the ground, thereby causing lacerations to his knees and injuries to his shoulder and arm. Gaskins also testified that he never moved away from the Officer Defendants, never resisted, was compliant, and never did anything that called for the substantial and injurious degree of force used against him. As Gaskins portrays it, he was merely present at the accident scene to aid his mother and document the accident. Unsurprisingly, the Officer Defendants tell a different story of belligerence, disobedience, and resistance. At this procedural stage, it is not for this Court to pass judgment on whose story is accurate, but rather to apply the objective reasonableness factors to the facts viewed in the light most favorable to Gaskins.

Applying those factors here, the facts demonstrate an unreasonable and excessive use of force. The amount of force used by an officer in carrying out an arrest "must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)). At the time of his arrest, Gaskins had not and was not committing any severe crime, he was unarmed and docile, he posed no threat to the officers, he obeyed instructions, he was sitting in the back of his SUV, he was not attempting to evade or flee, and he did not resist;[5] therefore there was "no apparent need or provocation for this alleged degree of force," which resulted in serious injuries to Gaskins's shoulder, arm, and knees. *See Andrews v. Scott*, 729 F. App'x 804, 811 (11th Cir. 2018). All told, under Gaskins's version of the facts, the Court finds the first three objective reasonableness factors weigh in Gaskins's favor.

And as to the fourth factor, whether the force was applied in good faith or maliciously, Gaskins testified that both officers used foul, threatening, and vitriolic language toward him and his children, and that Fletcher apologized to Gaskins after the incident. *See Hadley*, 526 F.3d at 1329 (holding that punching a subdued arrestee

---

[5] While the Officer Defendants ordered Gaskins to leave the scene while Gaskins was in the SUV, the officers did not give Gaskins time to respond to that order before ripping him out of the vehicle—rendering the order hollow. "In other words, [Gaskins] could not resist if he had no time to comply." *Brown v. Haddock*, No. 5:10-CV-130/RS-GRJ, 2011 WL 1655580, at *4 (N.D. Fla. May 2, 2011) (finding officers were not entitled to qualified immunity where a complaint and non-violent arrestee was given a command but not given "time to respond to the officer's command" before being "taken to the ground and tased").

in the stomach and telling him to "[s]hut up, n***er" constituted excessive force). These statements by the officers, if true, are indicative that their actions may not have been carried out in good faith. Therefore, the Court finds that the final factor also weighs in Gaskins's favor.

All factors weighing in Gaskins's favor, the Court concludes the force used to effectuate Gaskins's arrest was unreasonable and excessive. Gaskins has satisfied his burden that the Officer Defendants violated a constitutional right.

### (2) Clearly Established

The next consideration is whether the right against excessive force under these facts was clearly established at the time the violation occurred; here, in July 2018. *See Crocker*, 995 F.3d at 1240.

A right is "clearly established" when it puts all reasonable officials on fair notice that the alleged conduct is unlawful. *Id.* The Eleventh Circuit has recognized three specific paths to "clearly establish" a right: (1) binding case-law, from either the Eleventh Circuit or the United States Supreme Court "with indistinguishable facts," (2) "a broad statement of principle within the Constitution, statute, or case law" that applies with "*obvious clarity* to the circumstances," or (3) "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Id.* (quoting *Lewis*, 561 F.3d at 1291–92). The first path is favored while the second two paths are "rarely trod" because the Supreme Court has

admonished lower courts to not "define clearly established law at a high level of generality." *Id*.

Applying this standard here, the Court concludes—as a matter of broad, clearly established principle and binding caselaw—that the Officer Defendants were on fair notice that, while effectuating an arrest, "ripping" a compliant, docile, non-threatening, non-resisting, unarmed person from his vehicle, without warning or directive, and then slamming him headfirst to the ground constituted excessive force. *See Ingram,* 2022 WL 1042688, at *5 (collecting and relying on cases published before 2018); s*ee also Smith v. Mattox*, 127 F.3d 1416, 1420 (11th Cir. 1997) (establishing that if an arrestee demonstrates compliance, but the officer nonetheless inflicts substantial injury using ordinary tactics, then the officer may have used excessive force); *Patel*, 959 F.3d at 1340 (citing *Stephens v. DeGiovanni*, 852 F.3d 1298, 1328 & n.33 (11th Cir. 2017)) (rejecting the "argu[ment] that [Eleventh Circuit] precedent prohibiting the use of gratuitous and excessive force against non-resisting suspects applies only when the suspect is handcuffed.").

The Eleventh Circuit discussed a similar concern in *Ingram* which involved the use of force during an October 2017 incident. There, the Court explained that it "is clear that serious and substantial injuries caused during a suspect's arrest when a suspect is neither resisting an officer's commands nor posing a risk of flight may substantiate an excessive force claim." *Ingram*, 2022 WL 1042688, at *5. The court

further noted that Eleventh Circuit precedent prior to October 2017 had clearly established that a "headfirst body slam" against "someone who was not resisting arrest" constitutes excessive force. *Id.* at *6. Thus, reasonable officers were on notice that "the use of seriously injurious force against a compliant, docile, non-resisting, and unarmed subject . . . constitutes excessive force." *Id.* (quoting *Sebastian*, 918 F.3d at 1311).

Here, Gaskins has presented evidence, though hotly disputed, that he was compliant, docile, non-resisting, and unarmed, before he was ripped out of his SUV without warning, and slammed head-first onto the ground. Therefore, consistent with *Ingram's* analysis and the many cases cited therein, it was clearly established as of July 2018 that the Officer Defendants' use of force here was excessive and unconstitutional. Although the Officer Defendants dispute Gaskins's version of events, those are questions of fact which preclude the entry of summary judgment on qualified immunity grounds. Summary judgment is denied as to Count V.

### B. Officer Fletcher Lifting Gaskins by his Handcuffed Wrists

In Count IV, Gaskins alleges that Officer Fletcher used excessive force when he lifted Gaskins off the ground and to his feet by his handcuffed wrists, which in

turn caused or contributed to injuries to his shoulder and arm.[6] Fletcher contends that he is entitled to qualified immunity on this claim.

Here, it is unclear, that as of July 2018, whether lifting an arrestee off the ground by his handcuffed wrists—which were handcuffed behind his back—constitutes excessive force. *See Huebner v. Bradshaw*, 935 F.3d 1183, 1191 (11th Cir. 2019) ("Officers routinely pull arrestees arms' behind their backs . . ."); *see also Rodriguez v. Farrell,* 280 F.3d 1341, 1351–52 (11th Cir. 2002) (holding that even where an officer "grabbed plaintiff's arm, twisted it around plaintiff's back, jerk[ed] it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that [the officer] was hurting him," the officer's actions did not constitute excessive force); *see also Vinyard v. Wilson,* 311 F.3d 1340, 1348 & n.13 (11th Cir. 2002) (collecting cases holding that painful handcuffing and pushing of arrestees, including against vehicles, is not excessive force). Indeed, Eleventh Circuit case law suggests that it is not. And in opposition to Fletcher's summary judgment motion, Gaskins offers nothing to substantiate that Fletcher's actions constituted excessive force, either as a result of binding case law or in terms of a broader, clearly established principle.

---

[6] Gaskins admits that he sought treatment for shoulder cramps earlier that day, and his medical records reflect that he sought treatment for bicep pain approximately fifteen days earlier. (Doc. 35-1 at 7; Doc. 33-14 at 1.)

Accordingly, the Court concludes that Officer Fletcher is entitled to qualified immunity based on his pulling Gaskins up from the ground by his wrists. Summary judgment is therefore granted as to Count IV.

**C. The City of Wetumpka**

Finally, in Count V, Gaskins brings an excessive force claim under § 1983 against the City of Wetumpka, otherwise known as a *Monell* claim. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Gaskins's Complaint alleges, in an extremely bare-bones fashion, that the City's "policies, procedures, practices, or customs within the [Wetumpka Police Department] allow, among other things, the use of excessive force when other more reasonable and less drastic measures are available." (Doc. 1 at 7.) Neither Gaskins's Complaint nor his brief in response to summary judgment provide any further detail as to what policy or custom within the police department caused the alleged use of excessive force against him.

Under *Monell*, municipalities are subject to § 1983 liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose editcs or acts may be fairly said to represent official policy, inflicts the injury[.]" *Monell,* 436 U.S. at 694.

The only policy that Gaskins points to states that Wetumpka police officers "may only use that force necessary to effect an arrest, and in response to,

accomplish[ing] an assigned task lawfully." (Doc. 35 at 4.) It is unclear if Gaskins is alleging that this policy itself is unconstitutional or whether Gaskins is pointing to this policy as evidence that the Officer Defendants' actions were unconstitutional.

Assuming that Gaskins is alleging that the policy itself is unconstitutional, his claim fails. There can be little doubt that on its face the City's policy regarding the use of force is constitutional. To that end, the policy permits force only when "necessary" and in order to effect a "lawful" arrest or task. That language is clearly within the confines of the Constitution. *See Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872, 104 L. Ed. 2d 443 (1989) (requiring that force need not be "necessary" but that which is "objectively reasonable").

Policy aside, for Gaskins's *Monell* claim to survive summary judgment under a custom theory, Gaskins "must bring forth some evidence of a pattern of improper training to sustain his claim, and he must show that [the city] was aware of the deficiencies in the program." *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005); *see also City of Canton v. Harris*, 489 U.S. 378, 387 (1989) (holding that constitutional policies can become unconstitutionally applied through a repeated failure to train). Furthermore, Gaskins must show "that this training or failure to train amounted to 'deliberate indifference' on the part of [the city]." *Id*. (quoting *City of Canton*, 489 U.S. at 389). And yet, Gaskins has failed to present any evidence

showing that the City engaged in a deliberately indifferent pattern or custom of improperly training officers.

For these reasons, Gaskins has failed to support his *Monell* claim, and summary judgment is due to be granted as to Count V against the City.

## VI.   CONCLUSION

For the foregoing reasons, it is hereby ORDERED as follows:

1. The Motion for Summary Judgment (Doc. 33) is DENIED as to the excessive force claim in Count V against Defendants David Fletcher and Brandon Foster.

2. The Motion for Summary Judgment (Doc. 33) with respect to the remaining claims is GRANTED.

3. The City of Wetumpka and Gregory Benton are DISMISSED as defendants in this matter.

4. The excessive force claim in Count V shall proceed against Defendants David Fletcher and Brandon Foster.

DONE, on this the 21st day of April 2022.

/s/ R. Austin Huffaker, Jr.
R. AUSTIN HUFFAKER, JR.
UNITED STATES DISTRICT JUDGE